**Frank S. DEUS**

v.

**ALLSTATE INSURANCE COMPANY.**

**Civ. A. No. 88–2099.**

United States District Court,
W.D. Louisiana,
Lafayette Division.

July 10, 1992.

H. Lee Leonard, H. Lee Leonard & Associates, Lafayette, La., for Frank S. Deus.

Dona J. Dew, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Allstate Ins. Co.

E. Gregory Voorhies, Voorhies & Labbe, Lafayette, La., for intervenors.

## OPINION

NAUMAN S. SCOTT, District Judge.

Before the court is the Motion of Allstate Insurance Company (Allstate) for judgment as a matter of law dismissing the claims of plaintiff, Frank S. Deus (Deus) on the issues of breach of contract, intentional infliction of emotional distress and prescription. We have granted the motion with respect to the breach of contract issue. We now address the issues of intentional infliction of emotional distress and prescription.

## JURISDICTION

We have jurisdiction under 28 U.S.C. § 1332, diversity of citizenship.

## PROCEDURAL BACKGROUND

### I.

On August 15, 1988, Deus filed suit against Allstate, which eventually developed into various state law claims of which only the claim of intentional infliction of emotional distress, breach of contract and the defense of prescription remained. The case commenced on April 6, 1992 before a jury on Deus' claims that defendant Allstate (1) breached its employment contract, and (2) intentionally inflicted emotional distress.

After plaintiff had rested his case, Allstate filed a Motion for Judgment as a Matter of Law to dismiss plaintiff's claims for breach of contract and for intentional infliction of emotional distress. Allstate later filed a supplemental memorandum raising the issue of prescription. The court granted the motion in part from the bench before the jury was charged dismissing the breach of contract claim and a written ruling on that issue signed by the court on June 15, 1992. The remaining issues were taken under advisement. The jury was charged on the issue of intentional infliction of emotional distress and returned a verdict in favor of plaintiff Deus on the issue of intentional infliction of emotional distress, awarding him $850,000.00 for lost income, past and future; $450,000.00 for

pain and suffering, past and future; $40,-000.00 for medical expenses, past and future; and $50,000.00 for disability, past and future, for a total award of $1,390,000.00. The court suspended the signing of a judgment and issued to both parties a briefing schedule on the pending motions.

Allstate's motion for judgment as a matter of law is filed pursuant to Fed.R.Civ.P. 50(a), previously termed "Motion for Directed Verdict and for Judgment Not Withstanding the Verdict." Paragraph (a)(1) of the new Rule 50 articulates the standard:

> If during the trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment ... on any claim ... that cannot under the controlling law be maintained without a favorable finding on the issue.

Fed.R.Civ.P. 50(a)(1).

Although this rule is new, the Notes of Advisory Committee on December, 1991 amendment of the rule are instructive in developing the standard for granting of such a motion: the new rule effects no change in the existing standard articulated in long-standing case law. Thus, we are compelled to consider prior cases under Rule 50 as binding authority.

■■■ Whether the evidence is sufficient to create an issue of fact for the jury is solely a question of law to be determined by the court. *U.S. for Use and Benefit of Weyerhauser Co. v. Bucon Constr. Co.,* 430 F.2d 420 (5th Cir.1970). The standard in passing on that question is the same whether it arises in the procedural context of a motion for directed verdict or of a motion for judgment notwithstanding the verdict. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 269 (5th Cir.1980). The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. *Improvement Co. v. Munson,* 14 Wall (81 U.S.) 442, 448, 20 L.Ed. 867

(1871). Wright & Miller § 2524. In the Fifth Circuit, it has been firmly established that, in diversity cases, a federal test controls on the sufficiency of the evidence. *U.S. v. Williams,* 441 F.2d 637, 644 (5th Cir.1971); *Pope v. Safeway Stores, Inc.,* 425 F.2d 1161 (5th Cir.1970).

The federal standard of review for motions for directed verdict and for JNOV was succinctly set out in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (*en banc*).

> [T]he court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

411 F.2d at 374.

With these parameters in mind, we address each of the issues of Allstate's motion.

## HISTORY

### II.

Plaintiff Deus was employed by Allstate as an insurance salesman from 1968 until his retirement as of January 1, 1989. His last day in his office was actually August 17, 1987; thereafter until January 1, 1989 he was on medical leave.

Traditionally before January 1, 1985, Allstate had two types of agents, Sears agents and company office agents (COAs). Sears agents usually were newly hired sales agents, in training at booths in Sears stores. COAs were trained agents, assigned in groups to large offices leased and run by Allstate. Each COA office expenses were paid for by Allstate, under a standard budget formula involving the dollar amount of sales production and the number of agents in each office.

State Farm Insurance, Allstate's chief competitor, by contrast had established its agents with great success in individual offices throughout the community. To meet this competition Allstate initiated the "neighborhood office agent" (NOA) program.

It was Allstate's intention to saturate the market geographically with many one-agent "neighborhood" offices. The plan was to invite existing COAs to voluntarily become NOAs, as well as to hire NOAs as direct hires. Because market saturation was the purpose of the new plan, it necessarily follows that Allstate intended to hire an inordinate number of new agents. In an effort to induce agents to join what Allstate considered a winning program for all concerned, it offered incentives. The NOA agents would be "entrepreneurs," having control over their own offices. Although Allstate retained the right to approve some aspects of the NOA offices, operational control of each office was retained by the individual NOAs. NOAs could open their own office, or go into partnership with other NOAs. They had complete discretion over office staff and expenses such as office furniture and automobiles. Allstate reimbursed NOAs for their expenses by a formula weighted to new business, similar to that applied to company offices. NOAs could finance themselves above the formula if they chose to do so. As an additional incentive, NOAs were allowed to do certain types of advertising which COAs had never been allowed to do, such as yellow pages advertising. The NOA program was introduced by Allstate to the agents in 1984 but did not become effective until January 1, 1985. COAs were encouraged in every legitimate way possible to join the program which Allstate believed would be highly profitable for both the agents and the company. There is absolutely no evidence that Allstate had any other motive for adopting and promoting this plan.

### III.

In May, 1985, Scott Raley (Raley) became Deus' immediate supervisor in the Lafayette company office on Felecie Street.

Like all other COAs, Deus was urged to change his status voluntarily from COA to NOA. He was asked to do so by Raley, as well as Dusty Rhodes, his territorial sales manager and Dave Blakenhorn, his district manager in Jackson, Mississippi. He agreed to "look at it" but never formally responded; he continued in his capacity as a COA.

Deus' problems at Allstate began in 1985, when he was put on "work program," the method by which Allstate sales agents are motivated to improve unsatisfactory performance. Phase 1 is "unsatisfactory work", Phase 2 is "corrective review" and Phase 3 is "job in jeopardy", leading to termination. The stages are determined by an agent's immediate supervisor performing a peer group analysis. These analyses are completed by grouping an agent with other agents in a similar competitive atmosphere (his peers) and comparing his sales figures with the sales figures of the other members of the group. No standard formula for determining the membership of the group existed in the Allstate Policy Manual, and formation of each such group was accomplished essentially at each supervisor's discretion. Peer group analyses were new in 1985, and its development was evolutionary in nature and coincided with the institution of the NOA program which began in January, 1985.

The Allstate rules have a built-in safety check so no one supervisor can single handedly put an agent through the work program for poor performance. Each phase of the work program must be reviewed and approved at a higher management level; terminations have to be approved by the corporate headquarters in Chicago.

Deus was first placed on the work program in August, 1985, and once again in the Spring of 1987. Deus claims that Raley "targeted" him and placed him on the work program unfairly by manipulating his peer group so that his production looked worse than it actually was. His final corrective review came in the Spring of 1987, when Raley put Deus on corrective review, based on a March 31, 1987 three member peer group analysis consisting of Deus and the other two agents in Deus' office. Ra-

ley gave Deus ninety days in which to equal the average sales in selected lines achieved by the other two agents in Deus' office, for the quarter ending March 31, 1987. Deus' deadline was issuance of the July, 1987 "E" list. The "E" list was a computer printout of quarterly production, up to and including June 30, 1987. Because of the obvious lag time it takes to enter the figures into the computer, the list is dated July 2, two days after the end of the quarter.

When the list was printed, Raley realized that the numbers reflected that Deus was two automobile policies short of his quota. Raley knew that Deus had, in fact, sold these policies, but they had not been included in the statistics because they were still in the underwriting department, and thus, technically, not final. Raley did not have the authority to change the official figures on the list, but did recommend to his superiors that these two policies be included so that Deus could be removed from the work program. Because Deus was not officially removed from the work program, Raley was required by Rhodes, his supervisor, to draft a letter placing Deus on the next level, job in jeopardy. Raley wrote the letter and placed it in the file. He also recommended that the two automobile policies be included in the June 30, 1987 printout list so that Deus could be removed from the work program and sent it, along with Deus' statistics, to his superiors in Jackson, Mississippi for approval.

Raley subsequently obtained approval to remove Deus from the work program, and wrote a memorandum to that effect on August 11, 1987, which he gave to plaintiff. A few days later, on August 17, 1987, Deus alleges that he had an argument with Raley in Raley's office on the subject of his August, 1987 work program. Although Deus terms it a "little hassle", it might have been more serious since Deus left the office upset and never returned.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### IV.

The case law in Louisiana for this tort is scarce; however, we have the advantage of a recent Louisiana Supreme Court case, directly on point, *White v. Monsanto Co.*, 585 So.2d 1205 (La.1991). This case "affirm[s] the viability in Louisiana of a cause of action for intentional infliction of emotional distress, generally in accord with the legal precepts set forth in the Restatement text and comments." *Id.* at 1209.

The elements required to prove intentional infliction of emotional distress, as set out by the court in *White v. Monsanto*, are lengthy but worth noting here.

Thus, in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.

.    .    .    .    .

[M]any of the cases have involved circumstances arising in the workplace.

.    .    .    .    .

[C]onduct which may otherwise be extreme and outrageous, may be privileged under the circumstances. Liability does not attach where the actor has done no more than to insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional stress. restatement, *supra*, comment g, § 46. Thus, disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually

been limited to cases involving a pattern of deliberate, repeated harassment over period of time.

. . . . .

The distress suffered must be such that no reasonable person could be expected to endure it.

*White v. Monsanto,* 585 So.2d at 1209, 1210 [citations omitted].

## V.

On this issue the jury was charged as follows:

Deus' second claim is for the tort of intentional infliction of emotional distress. In order to recover for intentional infliction of emotional distress, Deus must prove that:

(1) the conduct of Allstate was extreme and outrageous;

(2) that the emotional distress suffered by the plaintiff was severe; and

(3) that Allstate desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from Allstate's conduct.

An outburst of vile, profane, or embarrassing language directed at an employee by a superior in the course of 'dressing him down' or motivating him—even if it is crude, rough and uncalled for— does not amount to extreme and outrageous conduct giving rise to recovery for intentional infliction of emotional distress. Every employer must on occasion review, criticize, demote, transfer, and discipline employees. It is not unusual for an employer, instead of directly discharging an employee, to create unpleasant and onerous work conditions designed to force an employee to quit. Even if you find that such conduct existed in this case, while it may be deplorable, it is not the sort of conduct that, by itself, constitutes 'extreme and outrageous' conduct necessary to prevail on a claim for intentional infliction of emotional distress.

In order to be considered outrageous and extreme, conduct must go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Furthermore, the distress which is caused by the defendant's conduct must be such that no reasonable person could be expected to endure it.

There has been evidence presented that the plaintiff was particularly susceptible to emotional distress. Mr. Deus must prove that he has suffered damages and that the defendant's act or fault caused or resulted in those damages. Such proof must be shown to a legal certainty and by a reasonable preponderance of the evidence; a mere possibility is insufficient.

Additionally, unless Allstate knew of Mr. Deus' predisposition of emotional distress, then their actions must be evaluated according to the effect their conduct would normally have on a person or ordinary sensibilities. In other words, if Allstate did not know of Mr. Deus' predisposition, then you should not consider his condition when assessing liability.

Mr. Deus also must prove that Allstate's fault caused the damages claimed; when Mr. Deus fails to prove this cause-in-fact element, he is not allowed to recover damages, even though he may have proved Allstate's fault. There mere fact that an employer knows that the employee will regard the conduct as insulting or will have his feelings hurt is not enough. Unless Allstate had knowledge that Mr. Deus would be particularly susceptible to suffering emotional distress as a result of its conduct, Allstate's conduct should be judged on the effect that conduct would have on a person of ordinary sensibilities.

If you find that Allstate knew that Frank Deus was particularly susceptible to emotional distress, then that may be considered as a factor in determining whether Allstate's conduct was extreme and outrageous.

Moreover, conduct which ordinarily would be considered extreme and outrageous may be privileged under the circumstances. In order to be privileged you must find that Allstate simply exercised its legal right in a permissible way,

even if Allstate knew their actions would cause Deus emotional stress.

## VI.

It is the burden of Deus to prove by a preponderance of the evidence that each incident of which he complains was done by Allstate for the specific purpose of causing Deus specifically, and only Deus, emotional distress. It is not enough to complain of annoyances, inconveniences, discourtesies or stresses which are encountered or suffered in common with other agents. Deus must prove that he was singled out, that he was targeted by Allstate and that each act was performed by Allstate with the specific intent of causing him, Deus, emotional distress. *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir.1991); *Dean v. Ford Motor Credit Co.*, 885 F.2d 300 (5th Cir. 1989).[1] Nor is it sufficient to prove that some other Allstate agent at some other time, some other place and some other circumstances was targeted by some other Allstate supervisor.

It should be borne in mind also that Allstate had adopted a new and radically different merchandizing strategy governing the sales of its policies. The reorganization and revisions involved in the NOA program were foundational in nature and the establishment of new agents, new office organizations, new financing, new techniques were still being established when the acts complained of by Deus occurred. The stresses and strains of this nationwide reorganization were still present. Although Allstate, because of the success of its competitor, State Farm, was assured of success, many of its agents, like Deus, were reluctant to abandon the merchandizing structure to which they were accustomed.

It is the burden of Deus to prove by a preponderance of the evidence that each incident of which he complains was so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, acts to be regarded as atrocious and utterly intolerable in a civilized community. Mere insults, indignities, threats, annoyances, petty oppression or other trivialities are not enough. None of the acts of which Deus complains even approaches the characterizations mentioned above. Indeed, none of them are more serious than annoyances, petty oppression or other trivialities.

## VII.

Deus was a sick man long before the inception of the NOA program. His perception of the wrongs that he alleged against Allstate must be considered in the light of his pre-existing medical problems. He had a long history of tinnitus (ringing of the ears) which far outdated and outweighed any problems he had at Allstate. His medical records reflect that he sought treatment for this condition as early as 1980. Deus' expert witness, Dr. Charles I. Berlin, Director of the Hearing Research Laboratory at LSU Medical Center described the sound as extremely high frequency, and likened it to "the screeching of chalk or fingernails on a blackboard all day long." He stated unequivocally that tinnitus is not caused by stress, but that as stress increases, the tinnitus becomes less and less tolerable. He likened the condition to a dripping faucet. "At 8 a.m., it is not a bother when you are getting up and going about your business. But at three o'clock in the morning, it is irritating; if you happen to be having a bad night, it is worse—sort of a vicious circle." Dr. Berlin's assessment of Deus' condition was that "that much tinnitus could disable almost anybody, and in view of his self-report that he had this personality disorder, I felt he was beyond the means of coping with it."

Dr. Berlin noted that Deus had also presented himself as having "bipolar syndrome" (manic depression). Although Dr. Cloyd, Deus' psychiatrist, revealed that this is a "psychological" illness with a "neurochemical cause", plaintiff's primary treating professional, Frank T. Friedberg, was not a psychiatrist but a psychologist.

1. Although the cases cited herein are based on a Texas state law cause of action for intentional infliction of emotional distress, we find them instructive. Both the Louisiana and Texas cause of action rely heavily on § 46 of the Restatement (Second) of Torts. *White v. Monsanto,* 585 So.2d 1205 (La.1991); *Wilson v. Monarch Paper Co.,* 939 F.2d 1138 (5th Cir.1991).

Dr. Friedberg's history of Deus reveals that plaintiff had experienced depressive episodes since the age of 12. Dr. Friedberg opined that Deus "probably has an inherent tendency toward bipolar disorder, but stress reveals it." He testified that manic depression results from a genetic predisposition, and it can arise for no reason at all, although it often arises from "life stresses". These stresses are not limited to the work place, but can be caused by other factors, such as the stress caused by tinnitus over a period of years, or stress from surgery undergone by plaintiff in 1986. Dr. Friedberg also noted that some time in the past, stress had caused Deus to lose all his hair. This hair loss occurred long before the beginning of plaintiff's problems with Allstate.

Deus was given medication for his depression from 1986. He saw Dr. Cloyd for his manic depressive condition approximately 14 times for various medications in five years. Dr. Cloyd verified Dr. Friedberg's history on plaintiff. Deus had "prior clinical depression before, just to a lesser degree." Dr. Cloyd also confirmed that this manic-depressive state, or bipolar disorder, can arise spontaneously, without provocation. Generally Dr. Cloyd's impression of Deus was that he was depressed and frustrated. His notes of October 15, 1987 indicate that Deus told him that he knew the company (Allstate) was changing and he "understood the nature of the changes" but that he "got pissed."

Further, Deus testified that he considered his medical condition to be private information and that he deliberately and consciously withheld from Allstate any information regarding his medical problems. He never mentioned his bipolar disorder, nor did he ever explain the unusual intensity of his tinnitus, or that he was under physician's care and/or on medication. Therefore, Allstate's alleged actions must be evaluated according to the effect their conduct would have on a person of ordinary sensibilities.

## VIII.

In support of his claim that Allstate is guilty of intentional infliction of emotional distress, Deus articulates the following alleged tortious conduct on Allstate's part: Deus' work program of 1987, his argument with Raley on August 17, 1987, the "hire—hire—hire" incident, potential competition from NOAs, inadequate clerical staff, inadequate telephone answering staff, inability to advertise and the omission of the telephone number of Allstate's Lafayette area office from the telephone book one year.

■ A. Deus complains that the 1987 evaluation was unfair because medical insurance policies had not been used in the evaluation. However, medical insurance had been especially unprofitable for Allstate. It was so unprofitable, in fact, that Allstate has discontinued it all together. The purpose of placing Deus on work program was to encourage and to motivate him to improve his sales performance. It is certainly reasonable for the company to attempt to focus its sales agents on areas which are most profitable to the company. It is also reasonable for Raley to reflect that interest. We find his act to be consistent with a reasonable business practice of incentives. At trial, Deus testified that he knew that he was "in big trouble" because his "production was down".

■ Deus alleges that the peer group for his 1987 evaluation was unfair because its membership was not identical to his peer group of 1985. He describes his reaction to this as being "devastated", "miserable", and "apprehensive". We cannot follow with this reasoning. As we have stated previously, the use of peer groups was fairly new to Allstate; they were used for many purposes including corrective review. They were evolutionary in nature and as Allstate gained experience in their use, they became more tailored to their various purposes. For instance, the peer group in Deus' corrective review in July of 1985 was composed of all 13 agents in the Lafayette market area. In addition to Deus, this group included COA agents from Crowley and Opelousas as well as newly converted NOA agents. It could not be assumed that the competitive atmosphere and the opportunities encountered by agents in Crowley

and Opelousas were identical to those encountered by Deus in his Lafayette office in 1985 or 1987. It would be an even more ridiculous assumption to assert that the competitive conditions and opportunities of NOA agents are identical to those encountered by Deus in the COA office in 1987. The peer group for Deus' 1987 evaluation was limited to the three COA agents in his Lafayette office: Deus, Barron and Le-Doux. This was the peer group for Deus, for Barron and for LeDoux. It was not formed specifically for Deus. They were all operating under absolutely identical conditions in the same office in Lafayette. All were COA agents. We cannot imagine a more appropriate group for the purpose of corrective review. Was use and membership of the 1987 peer group so outrageous as to go beyond the bounds of decency? With all reasonable inferences in favor of Deus, we think not.

■ B. Deus alleges as another element of his tort claim that Raley spoke to him in a rude, unpleasant manner on his last day of work. Deus described this confrontation as "a little hassle" which lasted several minutes. Even if we view the evidence in a light most favorable to the non-moving party, we would have to hold in favor of the defendant, Allstate.

Indeed, if plaintiff had characterized this confrontation in much more extreme terms, the incident would still not rise to the level of tortious conduct under *White v. Monsanto, supra.* In that case, the Louisiana Supreme court specifically stated that "[l]iability does not extend to mere insults, indignities, threats, annoyances ..." and "[n]ot every verbal encounter may be converted into a tort; on the contrary, some 'safety valve must be left through which irascible tempers may blow off relatively harmless steam.' Restatement, *supra,* comment d, § 46; Prosser and Keaton, The Law of Torts, § 12, p. 59 (5th ed. 1984)." *White v. Monsanto* at 1209. Louisiana law grants Raley an irascible temper.

■ C. The "hire—hire—hire" expression is an excerpt from a note by Raley at an accountability meeting and was produced by Allstate on discovery, Exhibit P–

32. This note is undated and neither Raley or any other witness could supply the date of the meeting. From the content of the note it would appear that the meeting was simply an administrative meeting between supervisors and their superiors. The reference apparently was to the plan to hire many more new agents for the NOA program. These words "hire—hire—hire" were repeated time and time again throughout the trial by plaintiff's counsel as conclusive evidence of Allstate's intent to inflict emotional distress. How did these words inflict emotional distress on Deus? Nothing was said about Deus. Deus' testimony is absolutely free of any reference to "hire—hire—hire" and there is absolutely no evidence that Deus or any other agent attended this meeting. Nor is there any evidence that Deus ever knew of this phrase until Exhibit P–32 was produced by Allstate. Is Raley's act in making this note to be regarded as atrocious and utterly intolerable in a civilized community? With all reasonable inferences in favor of Deus, we think not.

D. Deus stated that he feared Allstate's employment of additional NOAs because of the potential of their moving near his office in competition with him. We do not understand this contention since Deus had peaceably survived the competition of four other COAs *in the same office* with him for a matter of years. Is Allstate's plan to hire additional NOAs to be regarded as atrocious and utterly intolerable in a civilized community? With all reasonable inferences in favor of Deus, again, we think not.

E. Finally Deus complains of inadequate clerical staff, inadequate telephone answering staff, inability to advertise and the fact that the telephone number of Allstate's Lafayette marketing area office was omitted one year from the telephone directory. We discuss these in the order in which they appear:

■ *Inadequate clerical staff.* Deus complains that the clerical staff was reduced to an inadequate level. Prior to the establishment of the NOA program, Deus' office housed five COA agents. Under Allstate's formula, the five agents are entitled

to two secretaries. Two of those COAs left to become NOAs. Under the same formula, the remaining three COAs were entitled to only one secretary. The reduction was dictated by the reduced population in the office, not by any change in formula by Allstate.

*Inadequate telephone answering staff.* Deus complains that he repeatedly had to answer the telephone, as did the other agents, when his secretary was away from her desk. Since the answering of telephones was a secretary's duty, the reduction in telephone answering staff has been discussed immediately above. It is possible also that the amount of telephone staff might have been increased by newly employed NOA agents seeking instructions from the two supervisors who occupied a separated part of the office.

*Inability to advertise.* Deus complains that he was unfairly prohibited from engaging in certain types of advertising in which NOAs were allowed to engage. This involves no act by Allstate. Deus, like all COAs, had never been allowed to advertise.

*Omission of the telephone number of Allstate's Lafayette area office from the telephone book one year.* The evidence shows that the telephone listing for the Felecie Street company office was omitted one year but there is absolutely no evidence as to how or why it happened. We find it obvious that no targeting of Deus was involved in this occurrence.

Were any of these acts so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and can any of them be regarded as atrocious and utterly intolerably in a civilized community? Again, with all reasonable inferences in favor of Deus, we think not.

## CONCLUSION

Having considered all the evidence in this case on Deus' allegation that Allstate was guilty of intentionally inflicting emotional distress upon Deus and having considered that evidence in the light and with all reasonable inferences most favorable to Deus, we find that this case borders on the frivolous; that Deus was not targeted or singled out by Allstate; that the acts which were the subject of Deus' complaints were either petty annoyances or trivialities, some of which were connected to the massive reorganization involved in the establishment of the NOA program; that Allstate had every right to install the NOA program and the adoption of that program was to meet the competition of Allstate's chief competitor, State Farm Insurance Company, and not for the purpose of intentionally inflicting emotional distress on the plaintiff, Deus. We find, in addition, that none of the acts which were the subject of Deus' complaints were so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and that none of them could be regarded as atrocious and utterly intolerable in a civilized community. Allstate's motion for a judgment as a matter of law dismissing the claim of plaintiff, Frank S. Deus, on the issue of intentional infliction of emotional distress is GRANTED.

Allstate's motion for judgment as a matter of law dismissing plaintiff's claim on the issue of intentional infliction of emotional distress having been granted, we find it unnecessary to consider and we decline to consider that motion on the issue of prescription.